# United States District Court
# Northern District of Indiana
# Hammond Division

| | |
|---|---|
| DENNIS FORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 2:07-CV-188-JVB |
| MINTEQ SHAPES AND | ) |
| SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

### A. Background

Plaintiff Dennis Ford has been employed as a laborer since 1996 by ISA, which was later acquired by Defendant Minteq Shapes and Services, Inc. On May 5, 2007, Plaintiff filed a complaint alleging wage discrimination (Count I), racial harassment (Count II), failure to issue safety equipment (Count III), and retaliation (Count IV). On September 5, 2007, the Defendant moved for Summary Judgment. The motion is now fully briefed and is ready for ruling.

### B. Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations

1

and quotation marks omitted). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id*. at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*. at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal

Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Comm., Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

**C. Material Facts**

The Plaintiff, an African American, began working for ISA Manufacturing Incorporated in 1996 as a laborer and continued to do so when Minteq acquired ISA in 2003. Plaintiff works at Minteq's Portage facility along with about 20 other employees.

The Plaintiff's direct supervisor is Ronald Humphreys who works with Plaintiff daily. The main duties of a laborer are casting, mixing, and mold stripping, but the Plaintiff has failed to perform the full range of duties. Plaintiff was asked if he would like to train on the mixing station, but when the Plaintiff went up to the mixing machine he said he was afraid of the machine and it made him want to stick his arm in the machine.

When Plaintiff spoke to a co-worker and saw his pay stub, he learned that he was being paid less than others so he went to Humphreys to ask about the disparity. (Ford Aff. #21). Plaintiff alleges that Humphreys said Plaintiff did not have to worry about his job because the company wanted to show that they were integrated. (Ford Aff. #22).

Since the Plaintiff started working at Minteq, he has received annual pay raises and merit increases. Annual raises are awarded to workers every year and merit increases are awarded for good performance. According to the Plaintiff's supervisor, the dollar amount of the Plaintiff's merit increases reflects that he has not taken on the additional responsibility of a laborer of mixing.

In spring 2006, the Plaintiff was overheard shouting and swearing about "those white people in management" by his co-worker, James Wampler. (Wampler Aff. #5). Wampler, in an effort to diffuse the situation, asked Plaintiff to whom he was referring when he said "those white people" and, from Plaintiff's response, Wampler understood Plaintiff to be referring to Minteq management. Wampler then asked Plaintiff, "well, if you refer to them as white people,

4

how should I refer to you?" Plaintiff replied, "I am a Black African American." (Wamper Aff. #5).

After this conversation, Wampler referred to Plaintiff as "Black African American" or "black man" two or three times that same day until he was confronted by another co-worker, Miguel Altieri. Wampler stopped using these terms and has not used those terms since that time.

Altieri, the Plaintiff, and Scott Smith approached Maintenance Supervisor Steven Smith about Wampler's use of the term "black man" to refer to the Plaintiff. Wampler stopped by Steven Smith's office while this discussion was taking place and was asked to participate. Wampler told Steven Smith that he called the Plaintiff "black man" or "black African American" because the Plaintiff asked him to do so. Steven Smith directed Wampler to call the Plaintiff either "Earl" or "Mr. Ford" and Wampler immediately stated that he would comply. Neither before nor after this meeting did the Plaintiff have any complaints or comments regarding this situation. Furthermore, the Plaintiff was never unable to do his job because of Wampler calling him "black man" or "Black African American." (Ford Dep. 122:21-23, June 30, 2008).

Also in spring 2006, the Plaintiff suffered an eye injury on the job because he was not wearing safety glasses: waste material from the bags got on his sleeve and when he went to wipe his face, he scratched his eye. Plaintiff washed his eye out after the accident and seemed fine, but the next day he could not see. The Plaintiff went to the company clinic to have his eye examined multiple times and the doctor told him that he needed to see an eye specialist and called to confirm this. After Plaintiff saw the eye specialist, he brought paperwork back to Minteq, and Minteq covered the bill.

Plaintiff alleges that when Plaintiff informed his supervisor Lee Nuzzo that he was seeing

5

an outside doctor, Nuzzo told him he was not allowed to receive any more phone calls at work. (Ford Aff. #21). Minteq's policy is that no employee shall receive telephone calls at the plant except in emergencies. (Humphreys Aff. #11). When an employee receives an excessive number of phone calls, the front office tells the employee that they will stop patching the calls through. Despite this policy, the Plaintiff received an excessive amount of personal phone calls. Employees who have had their phone privileges restricted include the Plaintiff along with three white co-workers. (Beemsterboer Aff. #5).

Plaintiff also alleges that he was unable to bring his grandchildren to the Christmas parties even though other employees were able to bring their families. (Ford Aff. #24). Plaintiff states that when he had been working at the plant for eight years a supervisor told him that he could bring his grandchildren, but only if he paid for the Christmas presents to be put under the tree, while other employees did not have to pay for their families' gifts. (Ford. Aff. #24).

**D. Discussion**

**1. Title VII Disparate Pay Claim**

Since Ford cannot provide any direct evidence of wage discrimination he can only prevail by attempting to present indirect evidence of racial discrimination. *Hildbrandt v. Il. Dept. Of Natural Resources*, 347 F.3d 1014, 1029 (7th Cir. 2003). The plaintiff has the initial burden, under this method, to establish a prima facie case by showing: (1) that he is a member of a protected class; (2) that he was meeting his employer's legitimate expectations; (3) that he suffered an adverse employment action; and (4) that he was treated differently than similarly situated employees who were not members of the protected class. *Id.* at 1030.

If the Plaintiff can establish a prima facie case of race discrimination, the burden then

6

shifts to the Defendant to present a legitimate, nondiscriminatory reason for its action. *Id*. If the employer can meet this burden the burden shifts back to the Plaintiff to show the employer's reason is pretextual. *Id*.

The Plaintiff cannot establish the fourth element of the prima facie case. While the Plaintiff is a member of a protected class, this alone is not enough to establish a prima facie case. The Plaintiff also appears to be meeting his employer's expectations, with the possible exception of not performing mixing duties. He also can demonstrate that he is being paid less than other workers at the plant, but the Plaintiff cannot prove that he was treated differently than similarly situated employees who were not members of the protected class. The evidence of differing wages between plaintiff and another co-worker does not satisfy the prima facie case since the Plaintiff fails to establish that the co-worker is similarly situated.

Even if the Plaintiff could establish a prima facie case of racial discrimination, the Defendant has a legitimate, non-discriminatory reason for its action, namely that the workers are paid based on the work they perform, not upon their race. The full range of duties for a laborer include casting, mixing, and mold stripping, but the Plaintiff did not perform the mixing duty so he received lower pay than those laborers who did perform the mixing duty. Furthermore, the Plaintiff has not shown that this reason is a mere pretext for racial discrimination.

**2. Race Harassment**

In order to show race harassment the plaintiff would have to establish that he was: (1) subject to unwelcome harassment, (2) the harassment was based on his race, (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or

offensive working environment, and (4) there is a basis for employer liability. *Herron v. Daimler Chrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2004). An employer is liable for a hostile work environment claim if the plaintiff's supervisor created the hostile work environment, or if a co-worker created the hostile work environment and the employer was negligent either in discovering or remedying the harassment. *Velez v. City of Chi.*, 442 F.3d 1041, 1047 (7th Cir. 2006). If an employer takes "reasonable steps to discover and rectify the harassment" it has discharged its legal duty. *McKenzie v. Ill. Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996).

To succeed on these harassment claims, the plaintiff has to show that the work environment was both subjectively and objectively offensive. *Id.* To rise to the level of objectively hostile, conduct must be sufficiently severe or pervasive that a reasonable person would find it hostile, and that the person exposed to such conduct must subjectively perceive the environment as abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

In determining whether conduct meets these standards, courts look at "the totality of circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Title VII is not a code of civility nor is it designed to purge the workplace of vulgarity and boorish behavior. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

The three main actions that the Plaintiff complains of in this count are (1) that his co-worker used the terms "black man" and "black African American" to refer to him; (2) Humphreys' comment that the Plaintiff didn't have to worry about his job because the company wanted to appear integrated; and (3) that he was unable to bring his grandchildren to the

8

company Christmas party.

The Plaintiff can show that he was subject to unwelcome comments and that these comments were based on his race. However, this does not rise to the level of race harassment since the Plaintiff has not shown that the comments made by his co-worker unreasonably interfered with his work performance by creating a hostile work environment. The terms that Plaintiff's co-worker used to refer to him were not objectively offensive and are used commonly to describe African Americans. Plaintiff refers to himself using those terms as well. Furthermore, Wampler only used the terms to refer to the Plaintiff after asking the Plaintiff what he would like to be called and only on a few occasions. When Wampler was asked to stop using these terms he immediately complied and has not used them since the Plaintiff complained. There is also no basis for employer liability since Minteq took corrective action when it learned of Plaintiff's complaints, by requesting that Wampler refer to the Plaintiff by name.

Also, Humphreys' comment about Minteq wanting to appear integrated was made on only one occasion and was not severe enough by itself to constitute a hostile work environment. Again, it was an unwelcome comment based on race, but it was not racial harassment since it was not sufficiently severe to rise to the level of a hostile work environment and did not prevent the Plaintiff from performing his job.

Finally, the Plaintiff claims that since he was not able to bring his grandchildren to the Christmas party he was being subjected to unwelcome harassment on the basis of his race. While the Plaintiff was upset that he was not able to bring his grandchildren to the Christmas party for a number of years and when he finally was able to do so he had to pay for their presents, he provides no evidence that these conditions were put in place because of his race.

9

Moreover, even though this happened for a number of years, it is not enough to constitute a hostile work environment since it did not interfere with his job performance.

**3. Safety Equipment**

The Plaintiff waived this issue by not addressing it in his Response to the Defendant's Motion for Summary Judgment. In any case, Federal and Indiana Occupational Safety and Health Acts cover any alleged violations of workplace safety statutes. 29 U.S.C. § 654; Ind. Code § 22-8-1.1. Initiating a lawsuit was an improper way of handling this complaint and instead the Plaintiff must file a written request for an inspection for alleged health and safety violations and may not file a legal action directly. 29 U.S.C. § 657(f)(1); Ind. Code § 22-8-1.1-24.1.

**4. Retaliation**

Title VII makes it unlawful for an employer to "discriminate against any of its employees . . . because he has opposed any practice made an unlawful practice by [Title VII]." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006). Retaliation, like discrimination claims, may be shown through the direct or indirect methods with the indirect method following the McDonnell Douglas pattern. *Id*. Under the direct method, the Plaintiff must show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action taken by the employer; and (3) there was a causal connection between the two. *Id*. at 663.

Where there is no direct evidence, the Plaintiff can show indirect proof that (1) he was engaged in a statutorily protected activity, (2) he suffered a materially adverse action, (3) he met his employer's legitimate expectations, and (4) that he was treated less favorably than a similarly

situated employee who did not engage in statutorily protected activity. *Id*. If the Plaintiff can establish this prima facie case, then the burden of production shifts to the employer to present evidence of a non-discriminatory reason for its action. *Id*. If the employer can meet this burden, the burden then shifts back to the plaintiff to demonstrate that the employer's reason is pretextual. *Id*.

The Plaintiff's retaliation claim revolves around the Plaintiff seeking outside medical attention for an eye injury sustained while on the job. Plaintiff claims that after he sought outside medical attention Minteq denied him the ability to receive telephone calls while at the plant. There is no direct evidence of a causal connection between the Plaintiff's denial of phone calls and his race, so the Plaintiff must proceed under the indirect method of proof.

The Plaintiff was not engaged in a statutorily protected activity when he alleges he was retaliated against. Seeking outside medical care is not a protected activity under Title VII, so the Plaintiff cannot prevail under the indirect method of proof. Next, the Plaintiff cannot show that he suffered a materially adverse employment action as a result of his participation in a protected activity. The company policy was to never allow employees to receive phone calls while at work and being denied the ability to receive phone calls at work was a mere inconvenience. Furthermore, the Plaintiff appears to have been meeting his employer's legitimate expectations, but since there were no other similarly situated employees who were treated more favorably than the Plaintiff, he cannot prevail on this claim. White employees were denied the same access to phones during the work day as the Plaintiff was. Furthermore, there is no evidence than Minteq's reason for restricting the Plaintiff's calls was pretextual since the Plaintiff and some of his white co-workers were restricted because of the number of phone calls they were receiving,

not for any other reason.

**E. Conclusion**

For these reasons, the Court grants the Defendant's Motion for Summary Judgment.

SO ORDERED on March 31, 2009.

             s/Joseph S. Van Bokkelen
            JOSEPH S. VAN BOKKELEN
            UNITED STATES DISTRICT JUDGE